# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 17, 2010

Lyle W. Cayce
Clerk

Nos. 05-70028 and 09-70018

FELIX ROCHA,

Petitioner – Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent – Appellee

Appeal from the United States District Court
for the Southern District of Texas

ON PETITION FOR REHEARING EN BANC

(Opinion 09/15/10, 5th Cir., 619 F.3d 387)

(Panel Rehearing Denied 11/17/10)

Before JOLLY, HIGGINBOTHAM, and HAYNES, Circuit Judges.

PER CURIAM:

The court having been polled at the request of one of the members of the court and a majority of the judges who are in regular active service and not disqualified not having voted in favor (FED. R. APP. P. AND 5TH CIR. R. 35), the Petition for Rehearing En Banc is DENIED.

Voting against en banc rehearing were: Chief Judge Edith H. Jones,

Judge Carolyn Dineen King, Judge E. Grady Jolly, Judge W. Eugene Davis, Judge Jerry E. Smith, Judge Emilio M. Garza, Judge Carl E. Stewart, Judge Edith B. Clement, Judge Edward C. Prado, Judge Priscilla R. Owen, and Judge Leslie H. Southwick.

Voting for en banc rehearing were: Judge Fortunato P. Benavides, Judge James L. Dennis, Judge Jennifer W. Elrod, and Judge Catharina Haynes.[*]

Upon the filing of this order, the clerk shall issue the mandate forthwith. See FED. R. APP. P. 41(b).


ENTERED FOR THE COURT

_Patrick E. Higginbotham_
_____
Patrick E. Higginbotham
United States Circuit Judge

---

[*] In 2009, the court decided to begin identifying the judges voting for or against en banc rehearing where a poll is taken and the request for en banc rehearing is denied.

DENNIS, Circuit Judge, joined by BENAVIDES, Circuit Judge, dissenting from the denial of rehearing en banc.

I respectfully dissent from the majority's refusal to grant rehearing en banc in Balentine v. Thaler, --- F.3d ---, 2010 WL 4630829 (5th Cir. Nov. 17, 2010), and Rocha v. Thaler, --- F.3d ---, 2010 WL 4630794 (5th Cir. Nov. 17, 2010).[1]

The Supreme Court in Michigan v. Long, 463 U.S. 1032 (1983), announced the standard for determining "whether various forms of references to state law [by state courts] constitute adequate and independent state grounds." 463 U.S. at 1038. That standard is: "[W]hen . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it do so." Id. at 1041.

The Balentine and Rocha panel opinions do not adhere to and faithfully apply the Long standard. Instead, they engage in the "process of examining [and unauthorized-Erie guessing at] state law," which the Court in Long found to be "unsatisfactory because it requires [federal judges] to interpret state laws with which we are generally unfamiliar, and which often, as in this case, have not been discussed at length by the parties." Id. at 1039. Further, the panel opinions, in effect, adopt the practice of denying federal court review "if the ground of the [state court] decision was at all unclear," which the Long Court expressly disapproved. See id. at 1038 (rejecting Lynch v. New York, 293 U.S.

---

[1]Unless otherwise indicated, "Balentine" refers to the substituted panel opinion in that case and "Rocha" refers to the panel's opinion denying panel rehearing.

52 (1934), which the Court characterized as "tak[ing] the strict view that if the ground of decision was at all unclear, we would dismiss the case"). The Court in Long rejected "outright dismissal of [such] cases [because] there is an important need for uniformity in federal law, and . . . this need goes unsatisfied when we fail to review an opinion that rests primarily upon federal grounds and where the independence of an alleged state ground is not apparent from the four corners of the opinion." Id. at 1039.

In Balentine and Rocha, the panels' authors, after initially adhering to the Long standard, make volte-face and examine ambiguous and obscure state court data to guess that the unexplained dismissals of state habeas claims by the Texas Court of Criminal Appeals (CCA) are based on an independent and adequate state ground. I respectfully but strenuously disagree because these opinions seriously undermine the Long standard in our jurisdiction and retrogress into the ad hoc method of dealing with cases involving possible independent and adequate state grounds that the Supreme Court expressly disapproved as "antithetical to the doctrinal consistency that is required when sensitive issues of federal-state relations are involved." Id. at 1039. For these reasons, I dissent from the very serious step the panel authors undertake, viz., departing from a full and faithful adherence to the Long standard, which the Court adopted in 1983 and has continuously adhered to in numerous decisions until the present day.

The Court's adherence to the full Long standard was demonstrated as recently as February 23, 2010, in Florida v. Powell, 130 S. Ct. 1195 (2010). There, the question presented was whether advice that a suspect has "the right to talk to a lawyer before answering any of [the law enforcement officers'] questions," and that he can invoke this right "at any time . . . during th[e]

4

interview," satisfies Miranda. Id. at 1199-1200. The Court held that it does. Id. Before fully addressing the issue, however, the Court addressed Powell's contention that the Florida Supreme Court, by relying not only on Miranda but also on the Florida Constitution, rested its decision on an independent and adequate state ground. See id. at 1201 (citing Coleman v. Thompson, 501 U.S. 722, 729 (1991) ("This Court will not review a question of federal law decided by a state court if the decision . . . rests on a state law ground that is independent of the federal question and adequate to support the judgment.")). "'It is fundamental,'" the Court stated, "'that state courts be left free and unfettered by us in interpreting their state constitutions. But it is equally important that ambiguous or obscure adjudications by state courts do not stand as barriers to a determination by this Court of the validity under the federal constitution of state action.'" Id. (quoting Minnesota v. Nat'l Tea Co., 309 U.S. 551, 557 (1940))

"To that end," the Court recalled, "we announced, in [Long] the following presumption":

> "[W]hen . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."

Id. at 1201-02 (quoting Long, 463 U.S. at 1040-41). "At the same time," the Court further recalled, "we adopted a plain-statement rule to avoid the presumption: 'If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision.'" Id. at 1202 (quoting Long, 463 U.S. at 1041).

Ultimately, the Court in Florida v. Powell concluded that "[u]nder the

Long presumption, we have jurisdiction to entertain this case. Although invoking Florida's Constitution and precedent in addition to this Court's decisions, the Florida Supreme Court treated state and federal law as interchangeable and interwoven; the court at no point expressly asserted that state-law sources gave Powell rights distinct from, or broader than, those delineated in Miranda." Id. at 1202 (citing Long, 463 U.S. at 1044). This decision shows that Long is alive and well in the Supreme Court and must be adhered to by this Court of Appeals.

Contrary to the Balentine and Rocha writers' apparent impressions, the Supreme Court has not changed or weakened the Long standard's requirement that when a state court decision fairly appears "to be interwoven with . . . federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion" we must assume that the state court decided as it did on the belief that federal law required it to do so. The Court's recent decision in Florida v. Powell emphasizes and turns on this very same provision. Nor, contrary to the panel authors' inference, has the Court treated its decision in Coleman v. Thompson, 501 U.S. 722, 729 (1991), as changing the Long standard in any way. This is evidenced by Florida v. Powell's citation of Coleman only for the proposition that federal courts will not disturb state court decisions resting on state law grounds independent of federal questions and adequate to support the judgment. Id. at 1201.

Also, Chief Justice Rehnquist's opinion for the Court in Arizona v. Evans, 514 U.S. 1 (1995), emphatically refused to alter or overrule the Long standard, agreeing with Justice Ginsburg that "'[s]ince Long, we repeatedly have followed [its] "plain statement" requirement.'" Id. at 8 n.2 (quoting id. at 33 (Ginsburg, J., dissenting), in turn quoting Harris v. Reed, 489 U.S. 255, 261 n.7 (1989)

6

(opinion of Blackmun, J.)) (citing Illinois v. Rodriguez, 497 U.S. 177, 182 (1990) (opinion of Scalia, J.); Pennsylvania v. Muniz, 496 U.S. 582, 588 n.4 (1990) (opinion of Brennan, J.); Maryland v. Garrison, 480 U.S. 79, 83-84 n. 4 (1987) (opinion of Stevens, J.); Caldwell v. Mississippi, 472 U.S. 320, 327-28 (1985) (opinion of Marshall, J.); California v. Carney, 471 U.S. 386, 389 n.1 (1985) (opinion of Burger, C.J.); Ohio v. Johnson, 467 U.S. 493, 497 n.7 (1984) (opinion of Rehnquist, J.); Oliver v. United States, 466 U.S. 170, 175 n.5 (1984) (opinion of Powell, J.)). The Court in Arizona v. Evans also cited its decision in Coleman, written by Justice O'Connor, not as changing Long but merely as "declining to expand the Long and Harris presumption to instances 'where the relevant state court decision does not fairly appear to rest primarily on federal law or to be interwoven with such law.'" Id. (quoting Coleman, 501 U.S. at 740).

Thus, the Court has consistently applied the Long standard as originally formulated to "obviate in most instances the need to examine state law in order to decide the nature of the state court decision, and . . . at the same time avoid the danger of our rendering advisory opinions." Long, 463 U.S. at 1041. And in determining whether a federal court can review a case that is alleged to rest on adequate and independent state grounds, the Court has "assume[d] that there are no such grounds when it is not clear from the opinion itself that the state court relied upon an adequate and independent state ground and when it fairly appears that the state court rested its decision primarily on federal law [or that the decision is interwoven with federal law]." Id. at 1042.

The panel opinions in Balentine and Rocha represent major erroneous departures from the Supreme Court's consistent decisions applying the Long standard, and, under the Long presumption, have erroneously barred federal court review of petitioners' federal constitutional claims.

7

In Balentine, the CCA acknowledged that Balentine presented two allegations based on federal law: "In the first allegation, applicant asserts that he was deprived of his Sixth Amendment right to effective assistance of trial counsel because counsel failed to adequately investigate, develop, and present mitigation evidence in the punishment phase of the trial. In his second allegation, applicant asserts that the prosecution unconstitutionally exercised peremptory challenges on two venire persons in violation of Batson v. Kentucky, 476 U.S. 79 (1986)." Ex parte Balentine, Nos. WR-54071-01, WR-54071-02, 2009 WL 3042425, at *1 (Tex. Crim. App. Sept. 22, 2009) (unpublished). However, the CCA failed to make clear what part, if any, federal law played in its disposition of the case. Instead, it created ambiguity by dismissing Balentine's application after stating only that his allegations fail "to satisfy the requirements of [Texas Code of Criminal Procedure] Article 11.071 § 5."[2] Because the CCA has interpreted an operative provision of the pertinent procedural rule, § 5(a)(1) of article 11.071, to include a requirement that an applicant must allege a prima facie claim based on federal constitutional law, the CCA's disposition is unclear as to whether it applied state or federal law, or both, in reaching its decision.

Thus the CCA decision in Balentine fairly appears to be interwoven with

---

[2]The operative part of the CCA order stated:

Applicant presents two allegations in his application. In the first allegation, applicant asserts that he was deprived of his Sixth Amendment right to effective assistance of trial counsel because counsel failed to adequately investigate, develop, and present mitigation evidence in the punishment phase of the trial. In his second allegation, applicant asserts that the prosecution unconstitutionally exercised peremptory challenges on two venire persons in violation of Batson v. Kentucky, 476 U.S. 79 (1986). We have reviewed the application and find that his allegations fail to satisfy the requirements of Article 11.071 § 5. Accordingly, applicant's application is dismissed, and his motion to stay his execution is denied. Likewise, applicant's motion to vacate the judgment rendered in his initial state writ application is denied, and the Court otherwise declines to reconsider that case.

Ex parte Balentine, 2009 WL 3042425, at *1.

8

federal law principles and the adequacy and independence of any possible state law ground is not clear from the face of the CCA's decision. Moreover, the CCA's decision does not in any way indicate clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds. Therefore, under the Long presumption, the Balentine panel's holding that federal habeas review is barred is clearly contrary to that presumption and the Supreme Court's decisions. See Florida v. Powell, 130 S. Ct. at 1203 ("We therefore cannot identify, 'from the face of the opinion,' a clear statement that the decision rested on a state ground separate from [the federal law principles of] Miranda." (citing Long, 463 U.S. at 1041 (the state court "need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached")). "[B]ecause the [CCA]'s decision does not 'indicate clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent state grounds,'" federal habeas review is not barred. Id. at 1203 (quoting Long, 463 U.S. at 1041) (brackets omitted). Accordingly, the Balentine decision should have been reconsidered en banc because it is based on a significant error of law affecting our habeas review of this and other Texas capital punishment cases.

The Rocha panel decision also should have been reconsidered en banc because it similarly fails to correctly apply the Long standard. Another operative provision of Texas Code of Criminal Procedure article 11.071, § 5(a)(3), on its face incorporates federal constitutional standards, and the CCA's judicial gloss on §5(a)(3) that left open the possibility that § 5(a)(3) encompasses federal claims based on ineffective assistance of counsel during the sentencing phase of death penalty trials, which Rocha raised. In Rocha itself, however, the CCA did not make clear whether its decision was based on state procedural default or on

9

the merits of the petitioner's underlying claim based on federal law, or both. The operative part of the CCA's order provided only: "We have reviewed the application and find that the allegations do not satisfy the requirements of Article 11.071, Section 5(a)(3). Therefore, we dismiss this application as an abuse of the writ." Ex parte Rocha, No. WR-52515-04, 2008 WL 5245553, at *1 (Tex. Crim. App. Dec. 17, 2008) (unpublished). Thus, for reasons similar to those in Balentine, because § 5(a)(3) incorporates federal-law standards and the CCA's previous interpretation is ambiguous about whether § 5(a)(3) encompasses Rocha's federal-law claim, the CCA's Rocha decision fairly appears to be interwoven with federal law; the adequacy and independence of any possible state law ground is not clear from the face of the CCA's decision; and the CCA's decision does not in any way indicate clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent state grounds.

## FURTHER DISCUSSION

I.    Background

A.    Texas' subsequent habeas statute[3]

These cases involve decisions by the CCA applying § 5 of article 11.071 of the Texas Code of Criminal Procedure,[4] which governs subsequent state habeas

---

[3]Texas calls its successive state habeas petitions "subsequent application[s] for a writ of habeas corpus." See Tex. Code Crim. Proc. art. 11.071 § 5.

[4]That statute provides, in relevant part:

(a)    If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

   (1)    the current claims and issues have not been and could not have been presented previously in a timely initial application or in a

10

applications. Section 5 allows a subsequent habeas application that satisfies any one of the three requirements of § 5(a) by presenting a claim based on: (1) a previously unavailable factual or legal basis (the "unavailability requirement"); (2) a constitutional error that affected the guilt/innocence phase of the trial; or (3) a constitutional error that affected the sentencing phase of the trial. Tex. Code Crim. Proc. art. 11.071 § 5(c). In order to dismiss such an application, § 5 requires the CCA to determine that the application has failed to satisfy all of the requirements of § 5(a), including § 5(a)(1). Id.

In 2005, the CCA added a judicial gloss, holding that to satisfy the requirements of § 5(a)(1), an applicant must also make a prima facie showing of a federal constitutional claim that requires relief from the conviction or sentence (the "prima facie showing requirement"). See Ex Parte Campbell, 226 S.W.3d

---

previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2)     by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3)     by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

. . . .

(c)     On receipt of the copies of the documents from the clerk, the court of criminal appeals shall determine whether the requirements of Subsection (a) have been satisfied. The convicting court may not take further action on the application before the court of criminal appeals issues an order finding that the requirements have been satisfied. If the court of criminal appeals determines that the requirements have not been satisfied, the court shall issue an order dismissing the application as an abuse of the writ under this section.

11

418, 421 (Tex. Crim. App. 2007); Ex parte Staley, 160 S.W.3d 56, 66 (Tex. Crim. App. 2005) (per curiam).[5] There is no dispute that the prima facie showing requirement is not independent of federal law. See, e.g., Rivera v. Quarterman, 505 F.3d 349, 359 (5th Cir. 2007).

## B.    The state court proceedings in Balentine and Rocha

Balentine presented two claims in his subsequent habeas application: He claimed that "he was deprived of his Sixth Amendment right to effective assistance of trial counsel because counsel failed to adequately investigate, develop, and present mitigation evidence in the punishment phase of the trial," a claim under Wiggins v. Smith, 539 U.S. 510 (2003); and he presented a claim under Batson v. Kentucky, 476 U.S. 79 (1986). See Ex parte Balentine, Nos. WR-54071-01, -02, 2009 WL 3042425, at *1 (Tex. Crim. App. Sept. 22, 2009) (unpublished). The CCA dismissed Balentine's subsequent habeas application because it found that "his allegations fail to satisfy the requirements of Article

---

[5]The CCA did not always read § 5(a)(1) to include the prima facie showing requirement. That court adopted the requirement following the Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304 (2002), in order to prevent a flood of potentially meritless Atkins claims raised in subsequent habeas applications brought pursuant to § 5(a)(1) from inundating Texas courts. See Ex parte Williams, No. 43,907-02, 2003 WL 1787634, at *1 (Tex. Crim. App. Feb. 26, 2003) (Cochran, J., concurring). Judge Higginbotham first noted that the prima facie showing requirement "render[ed] dismissal of [Atkins] claims under article 11.071 [§] (5)(a) a decision on the merits." Morris v. Dretke, 413 F.3d 484, 500 n.4 (5th Cir. 2005) (Higginbotham, J., concurring). Later, in Rivera v. Quarterman, this court held that "a decision that an Atkins petition does not make a prima facie showing—and is, therefore, an abuse of the writ—is not an independent state law ground." 505 F.3d 349, 359 (5th Cir. 2007). The CCA later imported the prima facie showing requirement to all other types of claims brought under § 5(a)(1). See Ex parte Staley, 160 S.W.3d at 63, 66 ("We need not . . . decide whether applicant's claim was legally available at the time he filed his original writ because we conclude that his application does not 'contain sufficient specific facts establishing that' his claim is cognizable even if Penry II, Tennard, and Smith created a new and previously unavailable legal claim."); see also Ex parte Campbell, 226 S.W.3d at 421 (citing Ex parte Staley, 160 S.W.3d at 64) (applying the prima facie requirement for § 5(a)(1) for claims under Brady v. Maryland, 373 U.S. 83 (1963), and Barefoot v. Estelle, 463 U.S. 880 (1983)).

11.071 § 5," without specifying a particular part of § 5(a). (I refer to CCA dismissals of this sort as "unexplained CCA dismissals.")

In Rocha, the petitioner "present[ed] a claim of ineffective assistance of counsel for failing to investigate, discover, and present significant mitigation evidence at his trial[] . . . [and] assert[ed] that the application meets the requirements of Article 11.071, Section 5(a)(3)." Ex parte Rocha, No. WR-52515-04, 2008 WL 5245553 (Tex. Crim. App. Dec. 17, 2008) (unpublished). The CCA dismissed the petitioner's subsequent state habeas application because it found "that the allegations do not satisfy the requirements of Article 11.071, Section 5(a)(3)." Id. at *1. Therefore, the question we must answer is whether the unexplained CCA dismissal in Balentine, which necessarily includes a determination that the § 5(a)(1) requirements were not met, and the CCA dismissal in Rocha, based on a determination that the requirements of § 5(a)(3) were not satisfied, rest on independent and adequate state grounds.

## II. Independent and adequate state grounds

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). Before its decision in Michigan v. Long, 463 U.S. 1032 (1983), the Supreme Court had struggled to adopt a consistent and workable standard for determining whether a state court decision rests on independent and adequate state grounds. See Coleman, 501 U.S. at 732-33. Among the Court's prior methods of analysis that it found "unsatisfactory" in Long was "[t]he process of examining state law . . . because it requires us to interpret state laws with which we are generally unfamiliar." 463 U.S. at 1039.

13

In Long, the Court resolved to provide a solution that would "minimize the costs associated with resolving ambiguities in state court decisions while still fulfilling [the] obligation to determine if there was an independent and adequate state ground for the decision."  Coleman, 501 U.S. at 733.

> [In Long, the Supreme Court] established a conclusive presumption[:] . . . "[W]hen . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."

Id. at 733 (quoting Long, 436 U.S. at 1040-41)).  "After Long, a state court that wishes to look to federal law for guidance or as an alternative holding while still relying on an independent and adequate state ground can avoid the presumption by stating 'clearly and expressly that its decision is based on bona fide separate, adequate, and independent grounds.'"  Id. (quoting Long, 436 U.S. at 1041) (brackets and ellipsis omitted).

The Court later applied the Long presumption to habeas review cases in Harris v. Reed, 489 U.S. 255 (1989).  In Harris, the state court had said that the petitioner's ineffective-assistance-of-counsel claim "could have been raised on direct appeal," which, under state law, would mean the claim was waived, but nonetheless, the state court considered and rejected the merits of the claim.  489 U.S. at 258, 266 (internal quotation marks and brackets omitted).  The Seventh Circuit Court of Appeals had found that the state court decision was "ambiguous" about whether it rested on procedural default under state law or on the merits of the petitioner's federal constitutional claims.  Id. "[N]onetheless[,] [the Seventh Circuit] asserted that a reviewing court should try to assess the state court's intention to the extent that this is possible."  Id.

14

(citations and internal quotation marks omitted).  The Supreme Court reversed, holding that "[t]he adequate and independent state ground doctrine, and the problem of ambiguity resolved by Long, is of concern not only in cases on direct review . . . , but also in federal habeas corpus."  Id. at 262.

In reaching this conclusion, the Court explained that "the mere fact that a federal claimant failed to abide by a state procedural rule does not, in and of itself, prevent [federal courts] from reaching the federal claim: The state court must actually have relied on the procedural bar as an independent basis for its disposition of the case.  Furthermore, ambiguities in that regard must be resolved by application of the Long standard."  Id. (internal quotation marks and brackets omitted).  The Court explained that the contrary presumption—that "if a state-court decision is ambiguous as to whether the judgment rests on a procedural bar, the federal court should presume that it does," id. at 263-64—"would impose substantial burdens on the federal courts. . . . [T]he federal habeas court would be forced to examine the state-court record to determine whether procedural default was argued to the state court, or would be required to undertake an extensive analysis of state law to determine whether a procedural bar was potentially applicable to the particular case.  Much time would be lost in reviewing legal and factual issues that the state court, familiar with state law and the record before it, is better suited to address expeditiously.  The 'plain statement' requirement achieves the important objective of permitting the federal court rapidly to identify whether federal issues are properly presented before it."  Id. at 264-65.

Coleman v. Thompson, 501 U.S. 722 (1991), similarly affirmed the Long standard.  The case involved a summary order of the Virginia Supreme Court, which, the United States Supreme Court noted, "stated plainly that it was granting the Commonwealth's motion to dismiss the petition for appeal.  That

15

motion was based solely on Coleman's failure to meet the [Virginia] Supreme Court's time requirements. There is no mention of federal law in the Virginia Supreme Court's three-sentence dismissal order. It 'fairly appears' to rest primarily on state law." Id. at 740. Therefore, the Court held that the Long presumption did not apply because the state court decision was unequivocally based only on state law.[6] The Coleman Court was clear that it was faithfully applying the Long presumption, not modifying it, id. at 733, and nothing in the Coleman decision suggests that it meant to alter or abrogate the Long presumption by requiring federal courts to attempt to discern the possible decisional basis of an ambiguous state court decision.

In fact, since Long and Harris, the Supreme Court has "repeatedly followed its 'plain statement' requirement." Arizona v. Evans, 514 U.S. 1, 8 n.2 (1995) (brackets and internal quotation marks omitted) (citing Harris v. Reed, 489 U.S. 255, 261 n.7 (1989) (opinion of Blackmun, J.)).[7] And the Court on

---

[6]In reaching this conclusion, the Court rejected Coleman's argument that in order to dismiss his petition for appeal as untimely, the state court necessarily had to decide that he was not entitled to an extension, which involved an antecedent decision about federal law. 501 U.S. at 742. The Court found that the Virginia Supreme Court's extension rule did not apply to Coleman's case because (1) the exception was applied only where the denial of the extension itself would cause the abridgment of a constitutional right (such as the right to counsel on appeal), which was not Coleman's claim; and (2) the rule was limited only to extensions of time for "filing a petition" and it was Coleman's notice of appeal that was filed late, not his petition. Id. at 741. The Court did not undertake an extrapolation of state law to decide whether the Virginia Supreme Court's perfunctory decision rested on either a federal-law or state-law ground. Instead, the Court simply determined that in Coleman's case there was clearly no federal-law issue interwoven with the state's procedural default rule; the state court had only dismissed Coleman's petition for appeal because his notice of appeal was filed late and therefore procedurally defaulted. Thus, the Court held that the state court decisions "'fairly appear[ed]' to rest primarily on state law." Id. at 740.

[7]See also Florida v. Powell, 130 S. Ct. 1195 (2010) (opinion of Ginsburg, J.); Ylst v. Nunnemaker, 501 U.S. 797 (1991) (opinion of Scalia, J.); Coleman v. Thompson, 501 U.S. 722, 740 (1991) (opinion of O'Connor, J.)); Illinois v. Rodriguez, 497 U.S. 177, 182 (1990) (opinion of Scalia, J.); Pennsylvania v. Muniz, 496 U.S. 582, 588 n.4 (1990) (opinion of Brennan, J.); Maryland v. Garrison, 480 U.S. 79, 83-84 n.4 (1987) (opinion of Stevens, J.); Caldwell v.

several occasions has expressly refused to reconsider or overrule the Long presumption and plain statement requirement. For example, Chief Justice Rehnquist, in Arizona v. Evans, explained the Court's reasons for adhering to the Long standard as follows:

> "[A]mbiguous or obscure adjudications by state courts [should] not stand as barriers to a determination by this Court of the validity under the federal constitution of state action. Intelligent exercise of our appellate powers [and habeas review by the federal courts] compels us to ask for the elimination of the obscurities and ambiguities from the opinions in such cases. . . . For no other course assures that important federal issues, such as have been argued here, will reach this Court for adjudication; that state courts will not be the final arbiters of important issues under the federal constitution; and that we will not encroach on the constitutional jurisdiction of the states." [] We therefore adhere to the standard adopted in Michigan v. Long . . . .

514 U.S. at 8-9 (footnote and citations omitted) (quoting Nat'l Tea Co., 309 U.S. at 557). Therefore, the Supreme Court has clearly and continuously reaffirmed the Long presumption, and instructed the federal courts to follow its mandate.

III. The Supreme Court's precedents dictate that the unexplained CCA dismissal in Balentine and the CCA dismissal citing § 5(a)(3) in Rocha do not rest on independent and adequate state grounds

The foregoing established principles make clear that the CCA's unexplained dismissal in Balentine and the CCA's dismissal in Rocha must be presumed to not rest on independent and adequate state grounds. In Balentine, the CCA's unexplained dismissal is ambiguous as to whether it was based on a determination that Balentine's application did not satisfy the unavailability

---

Mississippi, 472 U.S. 320, 327-28 (1985) (opinion of Marshall, J.); California v. Carney, 471 U.S. 386, 389 n.1 (1985) (opinion of Burger, C.J.); Ohio v. Johnson, 467 U.S. 493, 497 n.7 (1984) (opinion of Rehnquist, J.); Oliver v. United States, 466 U.S. 170, 175 n.5 (1984) (opinion of Powell, J.).

17

prong or the prima facie showing requirement of § 5(a)(1), or both. Because the prima facie showing requirement of § 5(a)(1) is a determination based on federal law, the CCA's unexplained determination that Balentine's application did not satisfy § 5, and therefore did not satisfy the requirements of § 5(a)(1), is a decision interwoven with federal law. It does not clearly and explicitly state that the CCA only decided that Balentine's application did not satisfy the state-law unavailability prong of § 5(a)(1).

Likewise, Rocha's claims were brought in a subsequent application pursuant to § 5(a)(3), which, on its face, allows claims that show a federal constitutional error. The CCA's perfunctory dismissal of Rocha's application is interwoven with federal law because it decided that his claims did not meet the requirements of § 5(a)(3), which are based on federal constitutional standards, and it did not clearly base its dismissal on a purely state-law procedural default rule. Therefore, under the Long standard, the CCA's decisions are presumed not to rest on independent and adequate state grounds and a federal court can review the merits of Balentine's and Rocha's constitutional claims on a habeas petition.

Contrary to what the panel opinions in Balentine and Rocha contend, Coleman dictates the same result. There, the state court merely granted the state's motion to dismiss Coleman's petition for appeal based on the state's procedural bar, which did not involve a federal-law issue; nor was there any relevant exception to the state procedural bar that could have involved a federal law determination. Therefore, the Coleman Court concluded that the state court decision fairly appeared to rest primarily on state law where there was no possible federal-law issue interwoven in the state's procedural rule, nor in the state court's application of that rule. 501 U.S. at 739. By contrast, the CCA's unexplained dismissal in Balentine necessitated a decision regarding the state's

18

procedural bar, which is interwoven with federal law.  And the CCA's dismissal in Rocha involved a state procedural rule that on its face depends on federal constitutional standards.  Thus, there is "good reason to question whether" the CCA's dismissals in Balentine and Rocha rested primarily on independent state grounds, and therefore, Coleman dictates that the Long presumption applies to these state court decisions.  See id.

IV.    The panel decisions in Balentine and Rocha

A.     Balentine and Rocha misapply the Long presumption

Balentine and Rocha conclude that, although "an unexplained denial of a subsequent application may have been based on a federal merits ground," that is not enough to trigger the Long presumption.  Balentine, 2010 WL 4630829, at *11-12; Rocha, 2010 WL 4630794, at *12.[8]  According to those opinions, "[t]here must be more than silence.  In some form, the state court has to make a fair indication that the merits of the claims were reached."  Balentine, 2010 WL 4630829, at *12; see Rocha, 2010 WL 4630794, at *12.  They conclude that "[w]hen the CCA dismisses a successive habeas application on the ground that it does not satisfy § 5(a)(1)," Coleman, requires the court to "read [the CCA's] order of dismissal to determine which of the two elements of § 5(a)(1) was the basis of the court's dismissal."  Rocha, 2010 WL 4630794, at *12 ("A boilerplate dismissal might be ambiguous on this point, but finding clarity in ambiguity is the bread-and-butter work of a federal court of appeals."); Balentine, 2010 WL 4630829, at *12-14.  And they endeavor to discover the hidden basis of the CCA's unexplained dismissal by making an assumption about the CCA's decisional

---

[8]Although the CCA's dismissal in Rocha referred specifically to § 5(a)(3), the Rocha panel examines unexplained CCA dismissals like that in Balentine and reaches the same conclusions as the Balentine panel.  Therefore, I will discuss the opinions together.

19

process for all § 5 applications, and presuming that the CCA's decision was based on the unavailability prong of § 5(a)(1) because Balentine's application did not show that his claim was previously unavailable. Rocha, 2010 WL 4630794, at *10, *12; Balentine, 2010 WL 4630829, at *12-14.

Balentine and Rocha short circuit the Long presumption by contending that a federal court should attempt to determine whether an ambiguous state court decision applying the state's procedural rule, which includes a federal-law component, rests on independent and adequate state grounds. However, the Long standard, also applied in Harris and Coleman, is that a state court decision, which fairly appears to be interwoven with federal law, and which does not clearly rest on independent and adequate state-law grounds, is presumed to be a decision dependent on federal law. Long specifically rejected "[t]he process of examining state law" in order to determine the basis of an ambiguous state court decision. 463 U.S. at 1039. And Harris reversed a court of appeals decision that had "asserted that a reviewing court 'should try to assess the state court's intention to the extent that this is possible,'" when confronted with an ambiguous state court decision. 489 U.S. at 258, 266. Long also recognized that federal courts "may review a state case decided on a federal ground even if it is clear that there was an available state ground for decision on which the state court could properly have relied." 463 U.S. at 1039 n.4.

Coleman does not sweep away the Long presumption by requiring courts to guess at the grounds of an ambiguous state court decision, and Balentine and Rocha accordingly undertake a misguided examination of Texas law. In Coleman, the Virginia Supreme Court's order only granted the state's motion to dismiss Coleman's petition for appeal because his notice of appeal was untimely, which involved no antecedent or concurrent question of federal law. Coleman does not stand for the proposition that when faced with a state court decision

20

interwoven with federal law, a federal court should examine the state's procedural law and guess as to the decisional basis for the state court's decision. Indeed Coleman never purported to upset the fundamental premise of the Long presumption.

By expounding on state law and the unspoken decisional processes of state courts in order to unearth the possible grounds for an ambiguous state court decision, the Balentine and Rocha panel opinions undermine the Long presumption and return the independent-and-adequate-state-grounds inquiry to where it was before Long. See Long, 463 U.S. at 1039 ("The process of examining state law is unsatisfactory because it requires us to interpret state laws with which we are generally unfamiliar . . . ."). Only in the limited subset of cases where the state court decision "fairly appears to rest primarily on state law" does Coleman hold that the Long presumption should not be applied. Here, the CCA's unexplained dismissal does not fairly appear to rest primarily on state law because such dismissal could have rested on the failure to satisfy the prima facie showing requirement of § 5(a)(1). By contrast, in Coleman there was no federal law issue interwoven with the state's procedural default rule or the state court's decision to grant the state's motion to dismiss the petition for appeal because Coleman's notice of appeal was untimely. Therefore, Coleman does not limit the application of the Long presumption to the CCA's unexplained dismissals.

Finally, Balentine concludes that because "Balentine's subsequent application made no effort to show that the facts or law underlying his . . . claim were unavailable to him at the time of his first state application," the CCA must have decided only that Balentine failed to satisfy the unavailability requirement of § 5(a)(1) and necessarily did not decide that he failed to satisfy the prima facie showing requirement as well. 2010 WL 4630829, at *14. However, Balentine's

21

subsequent habeas application to the CCA specifically alleged that the factual basis for his claim that his trial counsel was constitutionally ineffective in failing to investigate for mitigating evidence was previously unavailable, because the attorney on his first state habeas application, who was provided to him under Texas law, see Tex. Code Crim. Proc. art. 11.071 § 2, was similarly ineffective by also failing to investigate mitigating evidence. Subsequent Application at 4, 6-16, 37, Ex parte Balentine, 2009 WL 3042425 (Nos. WR-54071-01, WR-54071-02). Balentine alleged that the first time any of his attorneys investigated and located substantial mitigating evidence was after his first state habeas application, during his federal habeas proceedings. Id. at 6. Therefore, it is not clear that the CCA found Balentine's claim to have been previously available.

Furthermore, it simply does not follow that because one of two essential requirements appears not to be met that a state court necessarily did not base its decision on the failure of the other requirement. Cf., e.g., Harris, 489 U.S. at 258 (reviewing a state court decision that had explicitly found the petitioner's claim waived but still considered and rejected the merits of the claim). And Coleman recognized that "[a]fter Long, a state court that wishes to look to federal law for guidance or as an alternative holding while still relying on an independent and adequate state ground can avoid the presumption by stating clearly and expressly that its decision is based on bona fide separate, adequate, and independent grounds." 501 U.S. at 733 (internal quotation marks, brackets, and ellipsis omitted) (emphasis added); see also Long, 463 U.S. at 1039 n.4 (recognizing that federal courts "may review a state case decided on a federal ground even if it is clear that there was an available state ground for decision on which the state court could properly have relied"). Therefore, we cannot presume that the CCA's silence means that it did not base its decision on the alternative, federal-law requirement of § 5(a)(1).

22

B.     The Balentine and Rocha opinions' interpretation of the CCA's decisional process conflicts with CCA decisions

Balentine and Rocha also mistakenly conclude that we can discern the uncertain decisional basis in an unexplained CCA dismissals because "[t]he CCA first examines whether the factual or legal basis of the claim was unavailable at the time of the original application[,] [and] [o]nly if the applicant can surmount the unavailability hurdle does the CCA proceed to ask whether the application makes out a claim that is prima facie meritorious."  Rocha, 2010 WL 4630794, at *10.[9]  However, it is practical that if the CCA confronted a subsequent habeas application that it concluded failed to make the necessary prima facie showing, it would not need to determine whether the application satisfied the unavailability prong in order to dismiss the application.  Cf. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009) ("[T]he rigid Saucier procedure comes with a price.  The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the

---

[9] Balentine and Rocha rest this conclusion on a line in the CCA's decision in Ex parte Campbell, 226 S.W.3d 418 (Tex. Crim. App. 2007), which refers to the prima facie prong of § 5(a)(1) as "'the rest of the section 5(a)(1) bar.'"  Rocha, 2010 WL 4630794, at *10 n.96 (quoting Ex parte Campbell, 226 S.W.3d at 422) (emphasis added in Rocha).  Rocha concludes that because in Ex parte Campbell the CCA determined first that the applicant's claim was previously unavailable, and then determined that the applicant had failed to make the necessary prima facie showing, therefore all CCA decisions under § 5(a) must proceed in that order.  Id. at *10.  However, there is nothing in the CCA's decision in Ex parte Campbell that says these two components are necessarily decided in that order in every case.

Rocha also relies on Ex parte Hood, 211 S.W.3d 767 (Tex. Crim. App. 2007), which, according to the Rocha panel, "conclud[ed] that § 5(a)(1) did not authorize the CCA to consider the merits of a claim presented in a successive habeas application 'because the legal bases upon which applicant relies were available at the time he filed his second application' and undert[ook] no discussion of the prima facie merits of the applicant's claim."  Rocha, 2010 WL 4630794, at *10  n.97 (quoting Ex parte Hood, 211 S.W.3d at 770).  However, Ex parte Hood involves nothing more than an example of a decision by the CCA that fairly appears to rest primarily on state law, viz., the unavailability component of § 5(a)(1).  Under Coleman, the Long presumption is not needed to resolve ambiguity in such CCA dismissals.  Ex parte Hood does not support the conclusion that § 5(a)(1) requires the CCA to consider the two requirements of § 5(a)(1) in any particular order.

23

case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."). That the CCA would first reach the more easily decided of two possibly dispositive issues is not a novel proposition.[10] Indeed, decisions of the CCA confirm that the CCA does just that in many cases.

In Ex parte Staley, 160 S.W.3d 56 (Tex. Crim. App. 2005) (per curiam), the first CCA decision to judicially engraft the prima facie showing requirement for § 5(a)(1) to a non-Atkins claim, the CCA said:

> We need not, however, decide whether applicant's claim was legally available at the time he filed his original writ because we conclude that his application does not "contain sufficient specific facts establishing that" his claim is cognizable even if Penry II, Tennard, and Smith created a new and previously unavailable legal claim.

Ex parte Staley, 160 S.W.3d at 63. Similarly, in Ex parte Reed, No. WR-50961-06, 2009 WL 1900364 (Tex. Crim. App. July 1, 2009) (unpublished), the CCA dismissed the applicant's subsequent habeas application because it "fail[ed] to show a Brady violation" without discussing whether the factual basis for the claim was previously unavailable to the applicant. Id. at *1-2. Likewise, in Ex parte Johnson, No. WR-56947-02, 2009 WL 1165502 (Tex. Crim. App.

---

[10]To illustrate the practical sense of the CCA dismissing a subsequent application based only on a determination that the application failed to make the necessary prima facie showing and without reaching the unavailability prong of § 5(a)(1), as it did in Ex parte Reed, No. WR-50961-06, 2009 WL 1900364 (Tex. Crim. App. July 1, 2009) (unpublished), which involved a Brady claim: Assume there is a factual dispute about when the Brady material was first discoverable, e.g., the applicant asserts that he discovered the material after he filed his first state habeas application and the state contends that the material was reasonably discoverable by the applicant before he filed his first application for state habeas relief. If the Rocha panel is correct, then a laborious, fact-intensive inquiry would be required in order for the CCA to determine if the application satisfied the requirements of § 5(a)(1). If, however, the CCA could more easily determine that the application did not show a prima facie Brady violation—e.g., the CCA determined that Brady did not require that the disputed materials be disclosed—then there would be no efficient reason to first expend time and effort to make factual findings about the availability vel non of the material.

Apr. 29, 2009) (unpublished), the CCA found "that [the] applicant . . . failed to make a prima facie case of mental retardation" without discussing whether the factual or legal basis of the claim was previously unavailable. Id. at *1.[11] And in Ex parte Jackson, No. WR-60,124-02, 2010 WL 2843945 (Tex. Crim. App. July 19, 2010) (unpublished) the CCA dismissed the application in a summary order that said, in pertinent part: "Applicant presents two allegations in his application. In the first, he asserts that the State failed to disclose material, exculpatory evidence, and in the second, he asserts that his execution would violate the Eighth and Fourteenth Amendments because he is mentally retarded. We have reviewed the application and find that applicant has failed to make a prima facie showing of either claim." Id. at *1. In short, the CCA does not always first decide the unavailability prong of § 5(a)(1) before considering the prima facie showing component.

C.    Contrary to the Balentine and Rocha panel opinions, the plain text and the CCA's own interpretation of § 5(a)(3) permit adjudication of federal claims that do not meet the Sawyer standard in subsequent habeas proceedings

In his subsequent habeas application, Rocha raised for the first time a claim that his trial counsel was ineffective in failing to investigate and present mitigating evidence at the sentencing phase of his trial, a claim explained in Wiggins v. Smith, 539 U.S. 510 (2003). Rocha asserted that his subsequent

---

[11]Moreover, the dissenting opinion in Ex parte Johnson characterized the majority opinion as "reject[ing] [the defendant's] application, not because he fails to invoke new law under Article 11.071, Section 5(a)(1), but because he does not make out a prima facie case for mental retardation." 2009 WL 1165502, at *1 (Price, J., dissenting) (footnote omitted).

25

application met the requirements of § 5(a)(3), because it provides an avenue for claims asserting that "but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071"; and § 2(e)(1) of article 37.071 requires the jury to consider mitigating evidence when deciding whether to impose the death penalty, see Tex. Code Crim. Proc. art. 37.071 § 2(e)(1). Therefore, Rocha argued, his constitutionally ineffective representation caused the jury to not consider mitigating evidence, which, if the jury had received it, would have caused them not to impose the death penalty; and this constituted a claim under § 5(a)(3). The CCA dismissed Rocha's application because it found "that the allegations do not satisfy the requirements of Article 11.071, Section 5(a)(3)." Ex parte Rocha, 2008 WL 5245553, at *1. Balentine had similarly presented a claim in his subsequent habeas application that his trial counsel and first state habeas counsel had been ineffective in failing to investigate and present evidence in mitigation of the death penalty. Because the CCA dismissed Balentine's application due to its failure "to satisfy the requirements of . . . § 5," the CCA apparently decided that it also failed to satisfy the requirement of § 5(a)(3). Ex parte Balentine, 2009 WL 3042425, at *1.

On its face, § 5(a)(3) is interwoven with federal constitutional law: An application must show "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury." Therefore, for the CCA to decide that an application does not satisfy the requirements of § 5(a)(3), the CCA must necessarily decide that the claims raised by the applicant do not show a federal constitutional violation that affected the jury's decision to impose the death penalty. Accordingly, a decision by the CCA

26

that the requirements of § 5(a)(3) have not been met, without explanation, fairly appears to rest on federal law, and without a plain statement that the CCA did not reach the merits of the applicant's constitutional claims, we must presume that the CCA dismissed the application based on a decision about the merits of the applicant's federal constitutional claim. See Ake v. Oklahoma, 470 U.S. 68, 75 (1985) (where "the federal-law holding is integral to the state court's disposition of the matter," the state court's decision "depends on the court's federal-law ruling and consequently does not present an independent state ground for the decision rendered").

The Balentine and Rocha panel opinions, however, conclude that the CCA did not reach the merits of the petitioners' federal Wiggins claims because § 5(a)(3) allows only claims that satisfy the actual-innocence-of-the-death-penalty standard announced in Sawyer v. Whitley, 505 U.S. 333 (1992).[12] Therefore, the panels reason that when the CCA determined without explanation that Balentine's and Rocha's subsequent habeas applications failed to satisfy the requirements of § 5(a)(3), the CCA only determined that the applicants did not meet the Sawyer actual-innocence-of-the-death-penalty threshold, i.e., that the applicants did not show that they were constitutionally ineligible for the death penalty, and did not reach the merits of their Wiggins claims.

The Rocha and Balentine opinions are mistaken in their assessment that § 5(a)(3) is limited only to claims that can satisfy the Sawyer actual-innocence-of-the-death-penalty showing. The panels' conclusion conflicts with the plain

---

[12]Sawyer establishes a gateway for a federal habeas petitioner to have his otherwise unexhausted constitutional claims considered: Where the petitioner can show by clear and convincing evidence that he is actually innocent of the death penalty, a federal court can review the merits of his constitutional claim. Sawyer is not a freestanding claim for relief, but a gateway that allows a habeas petitioner to have his defaulted constitutional claims reviewed.

27

language of § 5(a)(3) and the CCA's precedent. Section 5(a)(3) provides an avenue for asserting a claim that "but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072." One of the "special issues" that a jury must decided pursuant to article 37.071 is "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." Tex. Code Crim. Proc. art. 37.071 § 2(e)(1). Accordingly, Balentine's and Rocha's Wiggins claims assert that but for their constitutionally ineffective representation, the jury would not have imposed the death penalty after considering the mitigating evidence, which their attorneys had failed to investigate and present. The plain text of § 5(a)(3), therefore, encompasses the petitioners' Wiggins claims, as Judge Haynes' concurring opinion in Rocha astutely notes. 2010 WL 4630794, at *16.

Furthermore, the CCA's explanation of the scope of § 5(a)(3) in the seminal case, Ex Parte Blue, 230 S.W.3d 151 (Tex. Crim. App. 2007), acknowledges this straightforward interpretation of the claims that are cognizable under § 5(a)(3). In describing the scope of § 5(a)(3) in Ex parte Blue, the CCA expressly left open the possibility that § 5(a)(3) was broader than Sawyer:

> We hesitate to declare that Article 11.071, Section 5(a)(3) wholly codifies the Supreme Court's doctrine of "actual innocence of the death penalty," even inasmuch as it has tied the exception to the bar on subsequent writs to the statutory criteria for the death penalty under Article 37.071. Since 1991, one of the special issues that determine whether capital punishment will be imposed is the so-called "mitigation" special issue, embodied in Article 37.071,

28

> Section 2(e).  Article 11.071 was originally promulgated in 1995, after this amendment to Article 37.071.  Therefore it is arguable that, in theory at least, a subsequent habeas applicant could demonstrate by clear and convincing evidence that, but for some constitutional error, no rational juror would have answered the mitigation special issue in the State's favor.  On its face this would seem to meet the criteria of Article 11.071, Section 5(a)(3). But it would also permit a subsequent state habeas applicant to proceed under circumstances that would not excuse a federal petitioner under Sawyer v. Whitley.  We need express no ultimate opinion on this question here.

Id. at 161 n.42 (citations omitted).  Judge Haynes has also noted the significance of this footnote, see 2010 WL 4630794, at *16, while the Balentine and Rocha panel opinions give it too little consideration or weight.  Furthermore, while the Balentine and Rocha opinions contend that Ex parte Blue limited § 5(a)(3) to claims that satisfy the Sawyer standard, the CCA in fact carefully avoided this result, instead saying: "Section 5(a)(3) . . . represents the Legislature's attempt to codify something very much like this federal doctrine of 'actual innocence of the death penalty,'" "the Legislature apparently intended to codify, more or less, the doctrine found in Sawyer v. Whitley," and "[t]his reading of the exception seems to limit its applicability."  230 S.W.3d at 160-61 (emphasis added).  Thus, the CCA's equivocal language reflects a clear intent to avoid saying that § 5(a)(3) is defined by the same standard as that announced in Sawyer.

Therefore, it is not clear that § 5(a)(3) does not encompass Balentine's and Rocha's Wiggins claims even if they did not first meet the Sawyer standard. According to the principles of Long, this ambiguity must be resolved in favor of federal review.  Therefore, because it fairly appears that the CCA's decision was interwoven with federal law, and no possible independent and adequate state ground was clearly announced or established, the Long presumption prescribes the same rule here: we must presume that the CCA dismissal was based on

29

federal law. If the CCA had made a clear and express statement that it had not decided the merits of the petitioners' Wiggins claims—for instance, by stating that the claims failed to satisfy § 5(a)(3) because they did not meet the Sawyer showing—then federal habeas review might be similarly limited to the petitioners' claims that satisfied the Sawyer showing. However, the CCA did not make this plain statement, and therefore, federal review of the petitioners' Wiggins claims is not barred. In concluding to the contrary, the Balentine and Rocha panels disregard the mandate of the Long rule.

V. The controlling circuit precedent of this Court holds that unexplained CCA dismissals do not rest on independent and adequate state grounds, and subsequent conflicting panel opinions are not precedential

In Ruiz v. Quarterman, 504 F.3d 523 (5th Cir. 2007), this court held that an unexplained CCA dismissal substantially similar to that in Balentine did not rest on independent and adequate state grounds. Ruiz involved a decision from the CCA that read in pertinent part: "We have reviewed these claims and find that they do not meet the requirements for consideration of subsequent claims under Article 11 .071, Section 5. This application is dismissed as an abuse of the writ . . . ." Ex parte Ruiz, No. WR-27328-03, 2007 WL 2011023 (Tex. Crim. App. July 6, 2007). Ruiz held that this order did not rest on an independent and adequate state ground: "The boilerplate dismissal by the CCA of an application for abuse of the writ is itself uncertain on this point, being unclear whether the CCA decision was based on the first element, a state-law question, or on the second element, a question of federal constitutional law." 504 F.3d at 527 (footnote omitted). In reaching this decision, the court relied simply on the Supreme Court's independent-and-adequate-state-ground doctrine and the rationale animating that doctrine:

30

> In deciding whether the CCA refused relief upon an independent state-law ground or upon the merits of Ruiz's petition we are aided by the bright light of Michigan v. Long[.] . . . This settled principle gives to state courts control over the federal review of their opinions. It has become a rote rule at the fingertips of every writing member of state courts of last resort—where studied ambiguity or clarity in the decisional footing is an art form and an absence of clarity in an opinion is seldom inadvert. Calibrated uncertainty can play a mediating role in garnering support for an outcome. To the point, that the CCA did not make clear that its decision rested on an independent state ground opens the merits of Ruiz's Wiggins claim to federal review. At best, the CCA did not make clear whether it relied on state or federal law in dismissing Ruiz's application. As the CCA is keenly aware, its choice of language was made against a background legal standard—which directs the CCA in either granting an application for consideration of subsequent claims or dismissing that application as an abuse of the writ—that is interwoven with federal law.

504 F.3d at 527 (footnote omitted) (citing Long, 463 U.S. at 1040-41; Coleman, 501 U.S. 722). Therefore, the panel decided that an unexplained CCA dismissal did not rest on an independent and adequate state ground.

Balentine and Rocha contend that Ruiz can be limited to its facts by arguing that Ruiz depended only on the fact that the CCA's summary order did not acquire a majority of the votes of the CCA judges. It is true that in Ruiz, the court said that "[i]n any event[,] the decisional basis here is uncertain[]" because only four judges joined the CCA's summary order and the necessary fifth vote for a decision by the en banc CCA came in a separate concurrence that explicitly reached the merits of Ruiz's application. Id. Therefore, there was no controlling five-vote opinion that rested explicitly on an independent and adequate state ground. However, this alternative holding does not affect Ruiz's principal rationale. The panel clearly read the unexplained CCA dismissal order alone as not clearly resting on independent and adequate state grounds, without regard

31

to the number of votes it garnered.  This is made clear in the following lines:

> In sum, the three opinions from the seven judges together do not clearly rest on an independent and adequate state ground.  Even if the order of the four-Judge plurality alone left the decisional footing certain, and it did not, Judge Womack's opinion, necessary to the court's judgment, pushes the court toward a clear merit ruling, and in any event deprives the plurality of a fifth vote on an independent and adequate state ground.  This leaves the decisional path far short of the clarity insisted upon by Michigan v. Long, . . . of which the CCA is acutely aware.

Id. at 528 (emphasis added).  Thus, the panel was clear that the vote-counting portion of its decision did not impact its decision that the summary order of the CCA did not rest on independent and adequate state grounds.  It also reflects the panel's correct understanding of the "clarity insisted upon by Michigan v. Long" as being the certainty that the decision rested on independent and adequate state grounds, and not clarity that the decision rested on federal grounds.

The rationale underlying Ruiz underscores this point: The independent and adequate state ground doctrine is meant to ensure that federal courts provide the requisite respect to state court determinations and to allow state courts to insulate their decisions from federal court review.  The CCA has available at its fingertips "rote rule[s]" for dismissing subsequent state habeas applications on grounds that are certainly independent and adequate—by making clear that its dismissal is dependent only on a finding that the factual and legal bases for the applicant's claim were previously available.  Therefore, because the CCA chose not to make a plain statement that its decisions rested on independent state grounds, there is no valid rationale by which the Rocha and Balentine panels can interpret the unexplained, obscure, and ambiguous CCA decisions as not having been interwoven with federal law and clearly based only on state law principles.

32

In place of Ruiz, the panel opinions in Balentine and Rocha rely on Hughes v. Quarterman, which held that an unexplained CCA dismissal rested on independent and adequate state grounds. 530 F.3d 336, 341-42 (5th Cir. 2008) (citing Coleman, 501 U.S. at 729-32, 735); see Ex parte Hughes, No. 45-876-02 (Tex. Crim. App. Nov. 14, 2001) (unpublished), quoted in Balentine v. Thaler, 609 F.3d 729, 737 (5th Cir. 2010). However, Hughes was decided after the circuit precedent in Ruiz, without citing or distinguishing Ruiz. Ruiz is, in fact, indistinguishable from Hughes. Because a decision by one panel of this court cannot overrule an earlier panel decision, see United States v. Castro-Guevarra, 575 F.3d 550, 552 (5th Cir. 2009), Hughes must give way to the clear precedential authority of Ruiz. More importantly, however, for all of the reasons discussed, Hughes is not a valid precedent because it is as inconsistent with the Supreme Court's precedents in Long and its progeny, as are Balentine and Rocha.

## CONCLUSION

The unexplained CCA dismissal in Balentine required a determination by the CCA that the application failed to satisfy the requirements of § 5(a)(1), which the CCA had interpreted to include a component that incorporates federal law, and the Balentine dismissal does not clearly and expressly state that it rested on an independent and adequate state ground. Therefore, because it is a determination interwoven with federal law, the Long presumption applies to the CCA's dismissal in Balentine. See Coleman, 501 U.S. at 739 (where an uncertain state court decision gives "good reason to question whether there is an independent and adequate state ground for the decision," the Long presumption applies). Without a clear statement that the CCA decision rests on independent

33

and adequate state grounds, such as that it was decided only on the unavailability prong of § 5(a)(1), the Supreme Court has repeatedly said that such a decision must be presumed not to rest on independent and adequate state grounds. See Long, 463 U.S. at 1039 n.4 (federal courts "may review a state case decided on a federal ground even if it is clear that there was an available state ground for decision on which the state court could properly have relied"). Indeed, this court held exactly that in Ruiz.

Furthermore, the CCA dismissals in Balentine and Rocha invoke § 5(a)(3), which, on its face is interwoven with federal constitutional principles, and from a plain reading of § 5(a)(3), appears to encompass Wiggins claims. The CCA in Ex parte Blue specifically left open this obvious interpretation of § 5(a)(3) that is broader than the state-law interpretation reached by the Balentine and Rocha panels. The CCA's unexplained and ambiguous dismissals in Balentine and in Rocha, which only stated that the applications failed to satisfy the requirements of § 5(a)(3), accordingly, fairly appear to be interwoven with federal law. Without a plain statement that the applications were dismissed based on a procedural default dependent only on state law, the decisions must be presumed not to rest on independent and adequate state grounds. Therefore, federal court review of Balentine's and Rocha's Wiggins claims is not barred.

Thus, it is clear that the Balentine and Rocha opinions conflict with the Supreme Court's precedents, the CCA's precedents, and our own controlling circuit precedent. Most important, however, the panel opinions seriously undermine the Long standard and retrogress into unauthorized Erie-type guessing as to the nature of unexplained state court death penalty subsequent habeas decisions in our circuit.

For these reasons I respectfully dissent from the majority's decision to deny an en banc rehearing in these cases.

34

HAYNES, Circuit Judge, dissenting from the denial of rehearing en banc:

Judge Dennis's dissent from the denial of rehearing en banc gives a scholarly analysis of the substantive reasons that the panel opinions in Rocha and Balentine are incorrect. I write to express the view that these cases merit en banc reconsideration because they involve a question "of exceptional importance." FED. R. APP. P. 35(a)(2), (b)(1)(B). Further, the decisions in question "conflict[] with a decision of the United States Supreme Court" (namely, Long and its progeny). FED. R. APP. P. 35(b)(1)(A). Congress has limited, but not eliminated, the role of federal courts in the process of state habeas review. See generally 28 U.S.C. §§ 2244, 2254. The contours of that line are exceptionally important in any case, but are particularly so here where the death penalty is involved. Accordingly, I respectfully dissent from the court's declination to rehear these cases en banc.